UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THERESA LEONARD, | Case No. CV12-10003 SVW (SSx) |
| Plaintiff, | |
| vs. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| METLIFE INSURANCE COMPANY, et al. | [Fed. R. Civ. P. 52] |
| Defendants. | |

After considering the parties' trial briefs, associated exhibits, and the arguments of counsel at the November 5, 2013 trial, the Court determines that the following facts have been established by a preponderance of the evidence:

## **FINDINGS OF FACT**

1. Plaintiff Theresa Leonard ("Leonard") was at one time a participant in the Raytheon Company Disability Plan (the "Plan"), an employee welfare benefit plan established by her former employer Raytheon Inc. ("Raytheon"). [RAYTHEON PLAN, §§ 2.6, 2.16, 2.17, pp. 7-8]

2. Pursuant to the terms of the Plan, Raytheon designated Defendant Metropolitan Life Insurance Company ("MetLife") as the Plan's claims administrator [RAYTHEON PLAN, § 2.5, p. 7] and conferred discretion upon MetLife to interpret the terms of the Plan and determine eligibility for benefits: [RAYTHEON PLAN, §§ 7.2 and 7.4, pp. 19-20]

3. The Plan was fully funded by employee contributions. MetLife did not fund the Plan benefits. [RAYTHEON PLAN, §§ 1.2 and 3.1(E), Article IV, pp. 6, 10-11]

4. In order to be entitled to benefits, Leonard must be totally disabled as defined by the Plan. For the first 18 months (the "Own Occupation Period"), the Plan sets forth the following requirements:

> (A) The Plan will pay Benefits during the Primary Benefit Period[1] to Participants who:
>
>> (1) become Fully Disabled while in a Period of Participation under the Plan; and
>>
>> (2) are under the care of a Doctor for their Full Disability; and
>>
>> (3) continue to be Fully Disabled;
>>
>> (4) have not attained the Plan's maximum age for receiving Benefits, as described in section 5.2(B)(3); and
>>
>> (5) has satisfied the Waiting Period.

[RAYTHEON PLAN, § 5.1, p. 11-12]

5. The Plan defines Fully Disabled as follows:

> <u>Full Disability or Fully Disabled</u> means that because of a sickness or injury which is not covered by an applicable workers' compensation

---

[1] The Primary Benefit Period is defined in Section 2.19 as follows: "2.19 Primary Benefit Period (First Phase) means, with respect to a Period of Disability, the period of time which starts on the first day of a Participant's Period of Disability regardless of any Waiting Period and which ceases on the earliest of: (A) eighteen (18) months after that Period of Disability begins; or (B) the day that Period of Disability ends." [RAYTHEON PLAN, § 2.19, p. 8] This will be referred to as the "Own Occupation Period."

-1-

statute, a Participant: (i) cannot perform the essential elements and substantially all of the duties of his or her job with the Employer even with a reasonable accommodation; and (ii) is under the care of a Doctor.

[RAYTHEON PLAN, § 2.11, p. 8]

6. After the 18-Month Own Occupation Period, the Plan changes the definition of disability to an "Any Occupation" standard and imposes the following requirements, detailed below and in paragraph 8, as follows:

> (B) The Plan will pay Benefits during the Secondary Benefit Period[2]
> to Participants who:
>> (1) are Totally Disabled on the day immediately subsequent to the last day of the Primary Benefit Period; and
>> (2) are under the care of a Doctor for their Total Disability; and
>> (3) continue to be Totally Disabled; and
>> (4) have not attained the Plan's maximum age for receiving Benefits, as described in section 5.2(B)(3).

[RAYTHEON PLAN, § 5.1, p. 12, hereinafter the "Any Occupation Period"]

7. The Plan defines Totally Disability under the "Any Occupation Period" as follows:

> <u>Total Disability or Totally Disabled</u> means that because of sickness or an injury which is not covered by an applicable workers' compensation statute:
>> (A) a Participant cannot do the essential elements and substantially all of the duties of his or her job with the Employer

---

[2] The Plan defines the Secondary Benefit Period as follows: "2.22 Secondary Benefit Period (Second Phase) means, with respect to a Period of Disability, the period of time, if any, which starts on the day after the end of the Primary Benefit Period and ceases on the earlier of: (A) the date that Period of Disability ends or (B) the date on which the Participant attains the maximum age for receiving Benefits under the Plan, as described in Section 5.2(B)(3)." [RAYTHEON PLAN, §2.22, p. 9] This is referred to as the "Any Occupation Period."

>even with reasonable accommodations; and (B) cannot do any other job for which he or she is fit by education, training or experience.

[RAYTHEON PLAN, § 2.23, p. 9]

8. The Plan sets forth the procedure for appealing an adverse benefits determination as well as the requirement that a claimant exhaust the Plan's administrative remedies before filing suit, stating:

>8.4 Appeal of Adverse Benefit Determinations
>
>(A) Claimants shall have a reasonable opportunity to appeal an adverse benefit determination to the Claims Administrator, which shall involve a full and fair review of the claim and adverse benefit determination…:
>
>>(1) Upon receipt of an adverse benefit determination, the claimant has up to one hundred and eighty (180) days to file an appeal with the Claims Administrator.
>
>10.9 Exhaustion of Plan Remedies. No action at law or in equity shall be brought to recover under the Plan unless and until the claims review procedures in Article VIII of the Plan have been complied with and exhausted.

[RAYTHEON PLAN, §§ 8.4 and 10.9, pp. 24, 27]

9. Leonard submitted a claim for benefits under the Plan claiming to be disabled as of March 12, 2010 from performing her sedentary job duties as a Configuration Analyst for Raytheon, primarily due to back pain. [LTD AR 1-3, 291-292.]

10. MetLife approved Leonard's claim for benefits effective May 21, 2010. [LTD AR 5-8]

11. MetLife obtained Leonard's most recent medical records. A clinical consultant reviewed those records on or around June 14, 2010 and concluded that no functional limitations were indicated. [LTD AR 277- 283]

12. By letter dated June 16, 2010, MetLife advised Leonard that the medical evidence did not support a finding of disabling restrictions and limitations as of June 7, 2010 and that no further benefits would be paid. [LTD AR 74]

13. Subsequently, MetLife received additional medical information concerning Leonard's condition as well as a signed authorization by Dr. John Prichard, Leonard's treating physician, for Leonard to undergo a Functional Capacity Evaluation ("FCE") as previously requested by MetLife. [LTD AR 289-293]

14. By letter dated July 8, 2010, MetLife advised Leonard that based upon the additional medical documentation received, and the fact that Leonard was scheduled to undergo an FCE, MetLife would extend her benefits through July 18, 2010. [LTD AR 95-98]

15. By letter dated July 19, 2010, MetLife extended Leonard's disability payments to August 1, 2010, pending outcome of the July 27, 2010 FCE. [LTD AR 107-109]

16. After receiving the report of the July 27, 2010 FCE [LTD 111-24], a MetLife clinical consultant reviewed the report and, on August 3, 2010, noted, in part:

> "[Employee] function falls within the sedentary job class. The overall level of work was significantly influenced by the client [*sic*] self limiting and inconsistent behavior. Therefore the sedentary level of work indicates a minimum ability rather than a maximum ability. Based on the individual task scores in dynamic strength, position tolerance and mobility [Employee] has the ability to work an 8 hour day for a 40 hour work week. [Employee] self limited on 42% of the 12 tasks. [Employee] had subjective pain complaints during the tests

> ["]my back is killing me.["] These pain statements were inconsistent with the observed movement patterns. … Gait pattern observed when leaving was identical compared to that of when she arrived. There were no changes in musculoskeletal status from beginning to end. The client drove herself to the exam and walks with a single point cane. …
>
> Conclusion regarding consistency of effort: Combining the results of the clinical consistency [comparisons,] the presence of self limiting behaviors and three formal consistency cross comparisons of grip strength data indicates that there is significant evidence of low effort and inconsistent behavior. [LTD AR 298-300.]

17. By letter dated August 4, 2010, MetLife advised Leonard that it had determined that she was no longer disabled under the terms of the Plan and no longer entitled to benefits. MetLife also advised Leonard of her right to appeal and the deadline for doing so, *i.e.*, within 180 days. [LTD AR 125-126]

18. By letter dated August 11, 2010, Leonard appealed MetLife's decision. [LTD AR 127-128]

19. As part of its appeal review, MetLife arranged for a medical review by an independent physician, Philip Jordan Marion, M.D. M.S. M.P.H., who was board certified in Physical Medicine and Rehabilitation, and who reviewed Leonard's medical records and the FCE Report. [LTD AR 149-152]

20. Dr. Marion also spoke with Dr. Prichard, Leonard's physician, on August 30, 2010, and Dr. Prichard advised Dr. Marion that "there is no specific acute medical issue that precluded [Leonard] from returning to work," "there were no cognitive deficits," and Leonard "is functionally capable of working at the sedentary occupational level" as long as she can change position as needed. [LTD AR 149]

21. Dr. Marion also spoke to Dr. Thomas Stephenson, Leonard's physician, who indicated that he saw Leonard on April 23, 2010 and that "he offered the patient

the opportunity to return to work with suggested work restrictions. However, the patient declined." Dr. Stephenson "had no specific opinion regarding [Leonard's] ability to work." [LTD AR 150]

22. Although Dr. Marion was unable to speak with the neurosurgeon who performed Leonard's lumbar laminectomny in 2007, Dr. Cary Alberstone's records indicated that Leonard was seen on June 30, 2010 and was post multilevel lumbar laminectomy 3-1/2 years, and that although she complained of pain, "[o]n physical examination, there were no objective neurological deficits," and her MRI of the lumbar spine MRI scan demonstrated "[e]vidence of multilevel lumbar laminectomy defect with no evidence of residual or recurrent stenosis." [LTD AR 150]

23. As to the FCE, Dr. Marion opined, in part as follows: "The claimant did not put forth maximum effort"; "[t]he testing also may not be valid, since the patient's level of inconsistency and self limiting behavior may represent an underestimate in the patient's actual occupational ability"; "[t]he performance during the FCE is not necessarily consistent with the clinical findings given her limited participation'" and "the patient's objective impairment supports the permanent restriction of sedentary occupational restrictions and limitations." [LTD AR 151]

24. Based on his review and discussions with Leonard's treating physicians, Dr. Marion opined that, despite her complaints of pain, Leonard's "[n]eurological examination is consistently documented as normal," and Leonard "remains otherwise independent with activities of daily living, fully ambulatory, and not restricted from driving a motor vehicle." Therefore, Dr. Marion concluded that "[f]rom a physical medicine and rehabilitation/pain management perspective, [Leonard's] objective impairment supports the permanent restriction of sedentary occupational activities with the ability to change position as needed." [LTD AR 151]

25. Dr. Marion's report was sent to Dr. Prichard, Dr. Alberstone and Dr. Stephenson for their review and comment. [LTD AR 153-155] Dr. Prichard was the only doctor that responded. In his September 5, 2010 response, Dr. Prichard

reiterated Leonard's complaints of pain and noted that "[Leonard] feels she is unable to work in this condition." [LTD AR 161] Dr. Prichard did not refute the specific findings or conclusions of Dr. Marion's report or refute his statements to Dr. Marion that Dr. Prichard believed Leonard was capable of sedentary work. [LTD AR 161]

26. Based upon Dr. Marion's review, by letter dated September 17, 2010, MetLife advised Leonard of its decision to uphold its prior adverse benefits decision. [LTD AR 166-170]

27. Additional medical records were submitted to MetLife, including a work status report from Dr. Prichard indicating that Leonard had been placed off work as of September 30, 2010 through January 3, 2011 [LTD AR 171-172], and a report by Dr. Anthony Rodas, M.D., of an on-site evaluation of Leonard conducted at Raytheon on April 28, 2011. [LTD AR 173-176]

28. Based upon its review of this additional information and the file, by letter dated May 11, 2011, MetLife approved benefits from March 12, 2010 (the last date paid) up through September 11, 2011, which was the end of the Own Occupation period. [LTD AR 183-185]

29. By letter dated May 11, 2011, MetLife advised Leonard:

> In the event your condition continues beyond September 11, 2011, and you are unable to return to work, we ask that you have your doctor(s) provide specific additional medical information in order for MetLife to consider your claim for continuation of benefits. This specific information should include the following:
>
> ▪ Copies of all office notes and diagnostic testing from January 2011 to the present
>
> ▪ Copies of the operative report and/or hospital discharge summary (if applicable).
>
> ▪ Copies of al rehabilitation or therapy notes and records (if applicable),

- Names and dosages of all medications prescribed (if applicable),
- Current diagnosis and treatment plan.
- Functional limitations and restrictions pertaining to your current medical condition,
- Functional abilities,
- Expected return to work date,
- Any complications, or co-morbid conditions that impact recovery period,

Upon receipt of additional medical documentation, MetLife will be able to give further consideration to your claim for continued benefits. Please note that Raytheon's LTD Plan requires that medical evidence must be provided for our review and must support the continuation of a disabling condition. [LTD AR 183-192]

30. On May 16 and May 17, 2011, Leonard advised MetLife that her request for SSDI benefits had been denied twice. [LTD AR 386-387]

31. By letter dated June 7, 2011, Attorney Jack Humes, advised MetLife that he was representing Leonard during her claim and that all further correspondence concerning the claim should be directed to his attention. Attorney Humes also advised that Leonard's claim for SSDI benefits had been denied. [LTD AR 203-215]

32. By letter dated June 23, 2011 to Attorney Humes, MetLife requested an authorization for MetLife to perform an FCE. [LTD AR 216-217]

33. By letter dated July 14, 2011 to Dr. Prichard, MetLife requested an FCE authorization, a completed Physician's Report of Physical Capacity and copies of "all office visit notes and diagnostic test results from 9/15/2010 to present." [LTD AR 222-227]

34. MetLife made follow up calls on July 1, July 8, and July 14, 2011 to Attorney Humes and on July 21, July 27, and July 29, 2011 to Dr. Prichard regarding the requested FCE authorization. [LTD AR 398-399, 401-407]

-8-

35. By August 2, 2011, MetLife had not received a response to its request for an FCE authorization from Attorney Humes or Dr. Prichard, and had not received the updated medical records requested in its May 11, 2011 and July 14, 2011 letters.

36. By letter dated August 2, 2011 to Attorney Humes, MetLife advised:

> Ms. Leonard must provide satisfactory proof, as required by MetLife, the Claims Administrator, of the nature and extent of the disability. The most recent medical documentation contained in Ms. Leonard's file is a Raytheon Site Evaluation performed by Dr. Anthony Roads [sic] on April 28, 2011. The most recent medical documentation contained in Ms. Leonard's file from her treating physician Dr. John Prichard is dated September 30, 2010.
>
> A Functional Capacity Evaluation authorization request was sent to you on June 23, 2011 and follow up phone calls were placed on July 1, July 8, and July 14, 2011. Functional Capacity Evaluation authorization requests were sent to Kaiser Permanente on July 14, 2011 and follow up phone calls were placed on July 21, July 27, and July 29, 2011 as well.
>
> We have determined that the current medical evidence on file does not allow us to properly evaluate the existence of a totally disabling condition preventing Ms. Leonard from performing any and all occupations for which she is reasonably qualified by education, training or experience. Absent from the file is the current severity of Ms. Leonard's impairment, physical exam findings, lab studies, or the functional capacity limitations that would prevent Ms. Leonard from performing any and all occupations based on education, training or experience. Therefore, under the terms of the Plan, we have no

alternative but to terminate Ms. Leonard's claim for benefits effective September 12, 2011. [LTD AR 233-234]

37. MetLife's August 2, 2011 determination letter also set forth the appeal procedure, and advised that any appeal must be submitted within 180 days after September 11, 2011. [LTD AR 234]

38. Neither Leonard nor Attorney Humes submitted any appeal.

39. Approximately one year later in August 2012, MetLife received a letter dated August 8, 2012 from Attorney Humes inquiring about the status of Leonard's claim. In the letter, Attorney Humes stated, "You were previously provided with an authorization from Dr. Pritchard that you requested." [LTD AR 240-242] Attorney Humes's letter did not say when this authorization was provided to MetLife. MetLife has no record of receiving the authorization, and so informed Attorney Humes. [LTD AR 254, 264]

40. On August 21, 2012, Attorney Humes appears to have faxed MetLife a copy of a cover letter from himself to MetLife dated September 5, 2011, attaching an FCE authorization signed by Dr. Pritchard and dated September 1, 2011. [LTD AR 252-253] The Court does not find it credible that Attorney Humes would have sent MetLife this FCE authorization in September 2011 and then failed to make any inquiry to MetLife about the status of Leonard's claim for almost an entire year, especially in view of the fact that MetLife had ceased paying disability benefits to Leonard after September 2011.

41. By letters dated August 21, 2012 and September 7, 2012, MetLife explained that because Leonard did not submit a timely appeal, MetLife could not further review her claim. [LTD AR 254-255, 264-265]

42. This lawsuit followed on September 5, 2012.

/ / /

/ / /

## **CONCLUSIONS OF LAW**

(1) Any conclusion under this category that is a finding of fact is also hereby adopted as a finding of fact.

(2) MetLife's objections to evidence outside the administrative record are sustained. *See Taft v. Equitable Life Assurance Soc'y*, 9 F.3d 1469, 1472 (9th Cir. 1993).

(3) The Plan at issue in this lawsuit is an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001, *et seq.*, which provides the exclusive remedy for Leonard's claims. *See* 29 U.S.C. § 1144(a); *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58 (1987).

(4) Under ERISA, a plan must establish and maintain a procedure by which a claimant shall have a reasonable opportunity to appeal an adverse benefit determination, and the time period in which a claimant may appeal an adverse disability benefit determination shall be at least 180 days following notification of a denial of a claim. 29 C.F.R. 2560.503-1(h); 29 C.F.R. 2560.503-1(h)(3)(i) and (h)(4).

(5) In accordance with § 8.4 of the Plan, MetLife provided Leonard with the statutorily mandated appeals process and at least 180 days to appeal its August 2, 2011 adverse benefits determination under ERISA.

(6) Because Leonard did not submit an appeal within the 180-day appeal period and failed to show that any appeal would be futile, Leonard failed to exhaust her administrative remedies as required by the Plan, and her claims are therefore barred. *Chappel v. Laboratory Corp. of Amer.*, 232 F.3d 719, 724 (9th Cir. 2000); *Sarraf v. Standard Ins. Co.*, 102 F.3d 991, 993 (9th Cir. 1996).

(7) Because the Plan documents vest broad discretionary authority in MetLife, the Court reviews its benefits determination under an abuse of discretion standard. *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 111-112 (2008); *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110-15 (1989).

(8) Because the Plan is fully funded by employee contributions and not by MetLife, MetLife does not operate under a "structural" conflict of interest and the Court's review involves a straightforward application of the abuse of discretion standard. *Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 629-30 (9th Cir. 2009).[3]

(9) Under the abuse of discretion standard, "the administrator's decision cannot be disturbed if it is reasonable." *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 675 (9th Cir. 2011). Reasonableness does not require that the reviewing court conclude that it would make the same decision, but rather the district court should consider whether the benefit determination was (1) logical, (2) plausible, or (3) had inferential support in the record. *Id.* at 676.

(10) MetLife's claim determination did not constitute an abuse of its discretion because Leonard failed to submit adequate proof that she was totally disabled and unable to perform the duties of any other gainful occupation and because MetLife's determination was reasonable and supported by the evidence in the Administrative Record.

(11) Judgment shall be entered in MetLife's favor.

DATED: December 12, 2013

*[signature]*

STEPHEN V. WILSON
UNITED STATES DISTRICT JUDGE

---

[3] Leonard did not establish that MetLife failed to comply with its own claims procedures, and, therefore, there are no procedural irregularities that would require the Court to review MetLife's decision with any level of heightened scrutiny. *Harlick v. Blue Shield of California*, 686 F.3d 699, 707 (9th Cir. 2012).